IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LASIKPLUS MURPHY, M.D., P.A., and    *
DAVID MURPHY, M.D., individually,    *
   *
       Plaintiffs,    *
   *
   *
vs.    *       No. 4:10cv00178 SWW
   *
   *
   *
LCA-VISION, INC.,    *
   *
       Defendant.    *

## MEMORANDUM AND ORDER

Plaintiffs LasikPlus Murphy, M.D., P.A. (LasikPlus Murphy), and David Murphy, M.D.

(Dr. Murphy), individually, bring this action against defendant LCA-Vision, Inc. (LCA) for

alleged breach of contract, alleged breach of fiduciary duty, and other alleged tortious and

criminal conduct. Before the Court is LCA's initial partial motion to dismiss plaintiffs'

complaint [doc.#7], which this Court deems as concerning and applying to plaintiffs' first

amended complaint filed on December 28, 2010 [doc.#28], and LCA's subsequent motion to

dismiss Count Ten of plaintiffs' first amended complaint [doc.#29].[1] Plaintiffs have responded

in opposition to LCA's motions and LCA has filed replies to plaintiffs' responses. Having

---

[1] After LCA filed its initial partial motion to dismiss plaintiffs' complaint, plaintiffs moved for leave to amend their complaint to add an additional claim, which this Court granted by Order dated December 7, 2010 [doc.#25]. Plaintiffs subsequently filed a second motion for leave to file a first amended complaint to correct certain clerical errors in the proposed first amended complaint, which this Court granted by Order dated December 28, 2010 [doc.#27]. Because the substance of plaintiffs' first amended complaint is identical to their original complaint concerning the claims that are the subject of LCA's initial partial motion to dismiss, the Court, in both Orders granting plaintiffs' motion for leave to amend, informed the parties that it would not require that they rebrief their arguments for and against partial dismissal but would simply deem LCA's partial motion to dismiss as concerning and applying to plaintiffs' first amended complaint. Following the filing of plaintiffs' first amended complaint, LCA, on January 11, 2011, filed a motion [doc.#29] to dismiss the one new claim in plaintiffs' first amended complaint, Count Ten – Breach of Fiduciary Duty.

considered the matter, the Court grants in part and denies in part LCA's initial partial motion to dismiss [doc.#7] and grants LCA's subsequent motion to dismiss Count Ten of plaintiffs' first amended complaint [doc.#29].

I.

LCA is a Delaware corporation that provides laser vision correction services under the LasikPlus brand.  Dr. Murphy is a licensed Arkansas ophthalmologist who owns and operates a private ophthalmology practice in Russellville, Arkansas.

According to the first amended complaint, LCA approached Dr. Murphy in 2007 regarding becoming affiliated as an eye surgeon to staff a new LasikPlus fixed-site laser vision correction center in Little Rock, Arkansas.  At the time, Dr. Murphy had been affiliated with TLC Vision Corporation (TLC), a national competitor with LCA.  Dr. Murphy agreed to affiliate with LCA and LCA arranged for Dr. Murphy to form LasikPlus Murphy, an Arkansas professional association of which Dr. Murphy was the sole shareholder.  Plaintiffs state this was done in order for LCA to open a laser vision correction center in Little Rock without violating the Arkansas Corporate Practice of Medicine Laws.

On May 8, 2007, LasikPlus Murphy entered into a Master Practice Management Agreement (PMA) with LCA under which LCA provided LasikPlus Murphy with a turnkey Lasik surgery practice at LCA's Little Rock, Arkansas Center (the "Little Rock Center").  Under the PMA, LCA agreed to provide to LasikPlus Murphy, *inter alia*, equipment and space rental, management services, third-party payor contracting, billing, and staffing.

Also on May 8, 2007, LasikPlus Murphy entered into a Professional Services Agreement (PSA) with Dr. Murphy for Dr. Murphy to provide lasik and PRK (photorefractive keratectomy)

vision correction services at the Little Rock Center.  Dr. Murphy and LasikPlus Murphy began to

provide such services at the Little Rock Center a few days after the parties entered into the PMA

and PSA.[2]

On December 12, 2008, Dr. Murphy was informed of LCA's plans to close the Little

Rock Center in a conference call with Dr. Jason Schmidt, LCA Regional Vice-President, and

Kris Taylor, also an LCA corporate representative.  Plaintiffs state that Schmidt and Taylor

advised Dr. Murphy orally that the Little Rock Center would be closing as of December 31,

2008.  LCA states that it provided Dr. Murphy with both written and verbal notice that it was

terminating the PMA effective February 17, 2009 and that it did not intend to staff the Little

Rock Center after December 31, 2008 but that Dr. Murphy could consider performing treatments

independently after that date.

Plaintiffs state that as of December 12, 2008, they had 52 patients scheduled in December

and an additional 30 patients scheduled for surgery in January 2009 and that despite the

scheduled closing, LCA encouraged Dr. Murphy to continue to perform eye surgery on patients

scheduled between December 12, 2008 and December 31, 2008.  In this respect, plaintiffs state

that LCA advised them to operate on their scheduled patients the next day and not to inform

patients of the Little Rock Center's closing until LCA had made the announcement public.  Dr.

Murphy, however, states he stopped operating as soon as he became aware of LCA's decision to

close the Little Rock Center.

Plaintiffs state that they believe the decision to close the Little Rock Center was made by

LCA well before December 12, 2008, and that unbeknownst to Dr. Murphy, LCA offered deeply

---

[2] Because the PMA and PSA are attached to plaintiffs' first amended complaint, the Court may consider them in resolving LCA's motions to dismiss.  *Great Plains Trust Co. v. Union Pacific. R. Co.*, 492 F.3d 986, 990 (8th Cir. 2007).

discounted services to patients scheduled after LCA's established closing date for the Little Rock Center if patients would reschedule their procedures before the Little Rock Center closed. Plaintiffs state that LCA did not notify these patients of the closing of the Little Rock Center when making these discounted offers.

Plaintiffs state that at the conclusion of the conference call on December 12, 2008, Dr. Murphy received via email a letter from LCA purporting to give Dr. Murphy and LasikPlus Murphy 60 days' written notice of the closing of the Little Rock Center effective December 31, 2008.  Plaintiffs state that Dr. Murphy was also given paperwork prepared by LCA, which he states he refused to sign, to dissolve LasikPlus Murphy and which would have effectively terminated LasikPlus Murphy and eliminated the 60-day written notice requirement for early termination under the PMA.

Plaintiffs state that following notification of LCA's intent to close the Little Rock Center, Dr. Murphy expressed his concern to LCA regarding continuity of patient care, noting that because of the nature of laser vision corrective surgery, significant post-surgical follow-up care is required for patients.   In this respect, plaintiffs state they advised LCA on December 15, 2008 that they had significant concerns regarding continuity of care provided to patients, handling of post-surgical complications, fulfillment of the lifetime acuity warranty, access to medical records, and risk management issues regarding the abrupt closure of the Little Rock Center and patient abandonment claims.

Plaintiffs state that as manager of LasikPlus Murphy and Dr. Murphy's practice at the Little Rock Center, LCA represented that it would send out a patient notification letter to Dr. Murphy's patients notifying his patients of the closure of the Little Rock Center.  Dr. Murphy

and LasikPlus Murphy advised LCA that they wanted to review and sign off on the letter before

it was sent to their patients, and that they would not approve the letter until LCA had come up

with an acceptable follow-up care plan.  Plaintiffs state that on December 15, 2008, Schmidt

advised them that they would have the opportunity to review and approve the patient notification

letter before it was sent to their patients.

On December 31, 2008, LCA sent Dr. Murphy a draft of a proposed patient notification

letter.  Dr. Murphy states he advised LCA that the content was unacceptable for a number of

reasons, including that the proposed language of the letter purported to transfer follow-up patient

care to a physician affiliated with TLC even though LCA represented to him and LasikPlus

Murphy that LCA had not yet reached a formal agreement with another TLC-affiliated physician

in Little Rock to provide follow-up care to Dr. Murphy's patients in Little Rock.  Plaintiffs state

that Schmidt nevertheless authorized the letter.  The patient notification letter, dated January 1,

2009, provides as follows:

> Thank you for the opportunity to participate in your laser vision corrective
> surgery, and hopefully a terrific transformation of your life.  We are glad we were
> able to earn your trust, and have you join the ranks of the many that enjoy the care
> provided by our local Little Rock staff.
>
> It is with regret and sadness that we announce the closing of our local Little Rock
> office, but want to extend our commitment to your continued care.  We remain
> available to see you at any of the remaining 75 locations nationwide for any care
> needed.  Additionally we have made arrangements for your remaining post-
> operative care to be provided by a local doctor at the TLC Center, located at
> 10809 Executive Center Dr, Suite 201, Little Rock, AR 72211.
>
> Your care is extremely important, and we invite you to contact our call center to
> facilitate any needed care at 800-334-2224 or contact TLC at 888-TLC-2020.  On
> call or after hours services can be reached by calling our emergency number at 1-
> 800-204-3870.
>
> Please be advised, benefits under our lifetime assurance policy will be provided

locally at the TLC Center until May 1, 2009, or any time at one of our remaining 75 facilities.  If you feel you need an enhancement please contact our call center at the toll free number listed above, or visit www.lasikplus.com for a list of locations.

The January patient notification letter contains the signature of Dr. Murphy, Ronny Bowman, O.D., and Susan Brummett, Director.  Dr. Murphy, however, claims his signature was a forged digital signature.

Plaintiffs state that on January 15, 2009, Dr. Murphy independently discovered that LCA had already sent out the patient notification letter on January 1, 2009 and forged his digital signature to the letter without his knowledge or consent.  Plaintiffs state that as with the December 31, 2008 draft of the patient notification letter, the letter that was actually sent out to Dr. Murphy's and LasikPlus Murphy's patients and which purported to be from Dr. Murphy did not, *inter alia*, state that LasikPlus Murphy and/or Dr. Murphy would be available to see their patients for follow-up care or even identify the name of the physician that would provide Dr. Murphy's and LasikPlus Murphy's patients follow-up care.  Moreover, state plaintiffs, at the time the January patient notification letter was sent out, LCA represented to Dr. Murphy and LasikPlus Murphy that it had not yet entered into a formal agreement with TLC for TLC-affiliated physicians to provide follow-up care to Dr. Murphy's and LasikPlus Murphy's patients in Little Rock.

Plaintiffs state that after learning of the unauthorized letter to their patients, they diligently contacted LCA and attempted to work with LCA to send out a supplemental patient notification letter containing important information to notify their patients that Dr. Murphy and LasikPlus Murphy had nothing to do with the closure of the Little Rock Center, that Dr. Murphy would be available for follow-up care in Russellville, Arkansas, that the physician to whom

6

follow-up patient care would be transferred would be identified by name, and patients would be ensured that Dr. Murphy and LasikPlus Murphy would work with TLC-affiliated physicians to provide a smooth transition of care.

Plaintiffs state that despite their diligent efforts to send a supplemental patient notification letter, LCA engaged in stalling tactics to prevent such a supplemental letter from being sent out while TLC refused to provide follow-up care to many post-surgical patients of Dr. Murphy and LasikPlus Murphy and refused to provide enhancements to other patients.

Plaintiffs state that they received numerous complaints from patients regarding the abrupt closing of the Little Rock Center and the lack of continuity of care with TLC following surgical procedures performed by Dr. Murphy and LasikPlus Murphy.  As a result of LCA's unauthorized actions, state plaintiffs, one former patient of Dr. Murphy and LasikPlus Murphy filed an administrative complaint with the Arkansas State Medical Board against Dr. Murphy complaining, *inter alia*, that Dr. Murphy abandoned her as a patient and concealed the scheduled closing of the Little Rock Center from her to induce her to undergo surgery.  Plaintiffs state the administrative complaint also alleged that Dr. Murphy lost the patient's medical records and/or refused to provide medical records to the patient, although LCA was the custodian of the records and was responsible for the lack of access to the medical records.

Plaintiffs state that pursuant to a Transitional Services Agreement (TSA), LCA referred all of their patients scheduled for surgery in January and February 2009, and thereafter, to TLC. Plaintiffs state that despite LCA's improper termination of the PMA with LasikPlus Murphy effective December 31, 2008, LCA continued to advertise in the Little Rock market in January and February 2009, and that upon information and belief, these advertisements used the likeness

and/or name of Dr. Murphy.[3]

Plaintiffs state that as custodian of their patient medical records, LCA also delayed and/or denied them access to patient medical records needed for board recertification processes and for follow-up patient care provided by both Dr. Murphy and TLC.[4]  Plaintiffs state that despite the fact that LCA left the Little Rock market on 19 days' notice, LCA effectively refused to waive a noncompete agreement contained in the PMA by conditioning the waiver of the noncompete on Dr. Murphy's agreement to dissolve LasikPlus Murphy as a corporate entity.  Plaintiffs state that such a dissolution would have acted as a waiver and release of many of the claims asserted in the first amended complaint against LCA for its egregious and criminal conduct, and that this noncompete agreement purportedly prohibited LasikPlus Murphy from performing laser vision correction services in the Little Rock market, and purported to prevent Dr. Murphy and LasikPlus Murphy from providing follow-up care to their patients in the Little Rock area.

Plaintiffs state that after nearly three months of negotiations, LCA finally agreed to send out a supplemental patient notification letter on March 27, 2009.  The letter was signed by Dr. Murphy and provides as follows:

> I am writing to follow-up with you regarding the closing of the LasikPlus vision center in Little Rock.  As your surgeon, I am committed to ensuring that you receive all appropriate follow-up care. I want to assure you that I stopped operating as soon as I became aware of LasikPlus's decision to close the center and I would like to apologize for any inconvenience the center's closing may have caused.

---

[3] LCA admits that advertisements placed with the media prior to December 12, 2008 may have continued to run in the Little Rock market in January and February 2009.

[4] Both the PMA and the PSA provide that LCA shall cooperate and make available to Dr. Murphy to be copied any patient records or charts for patients which have been treated by Dr. Murphy prior to the termination of the agreements.  PMA ¶ 2(S); PSA ¶ 12.

Although my affiliation with LasikPlus ended with the closing of the vision center, I have not left the area and would be happy to continue any post-op care that you require in my Russellville Clinic located at 1700 W. B Street, Russellville, AR.  Unfortunately, the Russellville Clinic is not currently equipped to provide laser vision correction enhancements.  Please understand that services provided at my Russellville Eye Clinic office which are outside of the initial post-op care period or unrelated to your Lasik procedure will be subject to usual and customary fees.

As indicated in previous correspondence, LasikPlus has made arrangements with TLC to provide post-operative care and any needed Lasik enhancements.  TLC's physician is Dr. Richard Brown.  Due to TLC's existing arrangements with Little Rock physicians, I am unable to provide Lasik enhancements and follow-up care in TLC's Little Rock facility.  However, I will work with Dr. Brown to ensure a smooth transition of your care from LasikPlus to TLC.

LCA Vision is currently serving as custodian of your medical records.  If you wish to transfer of [sic] your complete medical record to my Russellville Clinic, please sign and date the enclosed Authorization Form and return to LCA in the enclosed, self-addressed envelope.  If you have any questions or concerns regarding your procedure and/or follow-up care, please feel free to contact me (479) 968-7302.

Plaintiffs state that despite their lack of prior knowledge of the closure of the Little Rock Center and the fact that they were not involved in its closure, LCA refused to allow them to disclose these facts in the supplemental correspondence to their patients.

Plaintiffs subsequently filed this action asserting the following Counts in their first amended complaint against LCA: Count One – Breach of Contract; Count Two – Breach of Contract for Violation of State Law; Count Three – Breach of Contract for Violation of Federal Law (Mail Fraud); Count Four – Civil Recovery for Criminal Conduct; Count Five – Tortious Interference with Business Expectancies and Contractual Relationships; Count Six – Indemnity; Count Seven – Fraud; Count Eight – Invasion of Privacy; Count Nine – Libel/Libel Per Se; Count Ten – Breach of Fiduciary Duty; Count Eleven – Punitive Damages; and Count Twelve – Attorney's Fees.

9

II.

LCA moves to dismiss plaintiffs' tort, statutory, and breach of fiduciary duty claims pursuant to Fed.R.Civ.P. 12(b)(6), arguing that plaintiffs have taken a simple dispute over the termination of a contract and attempted to add a litany of claims in an effort to inflate their potential recovery.  LCA argues that a fundamental deficiency with plaintiffs' first amended complaint is that all of the tort and statutory claims are based upon the erroneous premise that the January patient notification letter improperly terminated physician-patient relationships, implied that Dr. Murphy was abandoning his patients, and somehow impugned Dr. Murphy's reputation.  LCA argues that the letter does not state or even suggest that plaintiffs were abandoning their patients or that LCA was terminating the physician-patient relationship between plaintiffs and the Little Rock Center's patients and that as plaintiffs have failed to plead a plausible basis for any of their tort, statutory, or breach of fiduciary duty claims, the following claims in plaintiffs' first amended complaint should be dismissed: Count Two – Breach of Contract for Violation of State Law; Count Three – Breach of Contract for Violation of Federal Law (Mail Fraud); Count Four – Civil Recovery for Criminal Conduct; Count Five – Tortious Interference with Business Expectancies and Contractual Relationships; Count Six – Fraud; Count Eight – Invasion of Privacy; Count Nine – Libel/Libel Per Se; Count Ten – Breach of Fiduciary Duty; and Count Eleven – Punitive Damages.[5]

A.

In reviewing a motion to dismiss, the Court must accept as true all factual allegations in

---

[5] Although the PMA and PSA contain Ohio choice of law provisions, the parties have chosen to analyze the issues under Arkansas law.  Accordingly, the Court will do the same.  The Court notes that LCA states that it is utilizing Arkansas law only for purposes of its motion to dismiss but the Court, in the interest of judicial economy, does not anticipate having to analyze the issues under Ohio law with respect to any motion for summary judgment after having today addressed those same issues under Arkansas law at the parties' behest.

the complaint, but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, — U.S. — , 129 S.Ct. 1937, 1950 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949. "Nor does a complaint suffice if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, — U.S. — , 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). A well-pleaded complaint may proceed even if it appears that actual proof of those facts is improbable and that recovery is very remote and unlikely. *Twombly*, 550 U.S. at 556. A complaint cannot, however, simply leave open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery. *Id.* at 561. Rather, the facts set forth in the complaint must be sufficient to nudge the claims across the line from conceivable to plausible. *Id.* at 570. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, — U.S. — , 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

### B.

#### 1.

The Court will address LCA's arguments in support of its initial partial motion to dismiss in the order presented, beginning first with Count Five – Tortious Interference with Business Expectancies and Contractual Relationships.  LCA argues this claim should be dismissed because plaintiffs fail to allege either a valid business expectancy or damages from LCA's interference.

The elements of the tort of interference are: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *Baptist Health v. Murphy*, 2010 Ark. 358, — S.W.3d —, —, 2010 WL 3835844 (2010).  The conduct of the defendant must be at least "improper."  *K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC,* 373 Ark. 14, 26, 280 S.W.3d 2, 11 (2008).  In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; and (f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties.  *Id*. 373 Ark. at 26-27, 280 S.W.3d at 11-12.  Intentional torts involve consequences which the actor believes are substantially certain to follow his actions.  *Baptist Health v. Murphy*, 365 Ark. 115, 123-24, 226 S.W.3d 800, 808 (2006).  The defendant must have either desired to bring about the harm to the plaintiff or have

known that this result was substantially certain to be produced by his conduct.  *Id.*  The existence

of a contractual relationship is not required to state a cause of action for tortious interference.

*Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.*, 300 Ark. 204, 205, 778 S.W.2d

218, 219 (1989).  Any prospective business relationship that would be of pecuniary value

constitutes a valid business expectancy.  *Stewart Title Guar. Co. v. American Abstract & Title*

*Co.,* 363 Ark. 530, 543, 215 S.W.3d 596, 603 (2005) (citing *Restatement (Second) of Torts §*

*766B*, cmt. C (1979)).

Plaintiffs' tortious interference claim is premised on their allegation that LCA sent the

January patient notification letter without Dr. Murphy's consent and forged his signature on it as

if he had authorized it, that Dr. Murphy did not agree with the content of the letter, and that the

"forged" January patient notification letter represented to Dr. Murphy's and LasikPlus Murphy's

patients that Dr. Murphy had abandoned them as their physician and transferred their care to an

unnamed physician affiliated with TLC.  Arkansas recognizes application of the tort of

interference in situations involving contract or business expectancies between a physician and

patient, *see Baptist Health*, 2010 Ark. 358, — S.W.3d —, —, 2010 WL 3835844, and the Court

finds that the January patient notification letter could reasonably be construed as representing

that Dr. Murphy was abandoning his patients.  Indeed, plaintiffs state that Dr. Murphy and

LasikPlus Murphy received numerous complaints from patients regarding the abrupt closing of

the Little Rock Center and the lack of continuity of care with TLC following surgical procedures

performed by Dr. Murphy and LasikPlus Murphy, and that as a result of LCA's unauthorized

actions, one former patient of Dr. Murphy and LasikPlus Murphy filed an administrative

complaint with the Arkansas State Medical Board against Dr. Murphy complaining, *inter alia*,

that Dr. Murphy abandoned her as a patient and concealed the scheduled closing of the Little

Rock Center from her to induce her to undergo surgery.  Given the nature of the January patient

notification letter and the alleged forging of Dr. Murphy's signature to that letter, the Court finds

that plaintiffs have alleged a facially plausible tortious interference claim and damages resulting

therefrom.  Accordingly, the Court denies LCA's motion to dismiss Count Five of plaintiffs' first

amended complaint.

2.

LCA next moves to dismiss Count Nine – Libel/Libel Per Se.  LCA argues this claim

should be dismissed because plaintiffs have not identified the specific defamatory statements, the

January patient notification letter is not defamatory, and plaintiffs have failed to allege damages

from the defamatory statements.

A viable action for defamation, whether it be by the spoken word (slander) or the written

word (libel), turns on whether the communication or publication tends or is reasonably

calculated to cause harm to another's reputation.  *Faulkner v. Arkansas Children's Hosp.*, 347

Ark. 941, 955, 69 S.W.3d 393, 402 (2002).  The following elements must be proved to support a

claim of defamation: (1) the defamatory nature of the statement of fact; (2) that statement's

identification of or reference to the plaintiff; (3) publication of the statement by the defendant;

(4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages.  *Id.* 347

Ark. at  955-56, 69 S.W.3d at 402.  *See also Boellner v. Clinical Study Centers, LLC,* 2011 Ark.

83, — S.W.3d —, —, 2011 WL 661686 (2011).

Again, the Court finds that the January patient notification letter could reasonably be

construed as representing that Dr. Murphy was abandoning his patients, thereby tending or

reasonably calculated to cause harm to plaintiffs' reputation – a necessary requirement for a viable action for defamation. *Faulkner*, 347 Ark. at 955, 69 S.W.3d at 402. Plaintiffs have thus stated a facially plausible claim of defamation by the written word and damages resulting therefrom. Accordingly, the Court denies LCA's motion to dismiss Count Nine of plaintiffs' first amended complaint.

3.

LCA next moves to dismiss Count Seven – Fraud. LCA argues this claim should be dismissed because plaintiffs have failed to plead fraud with particularity.

In Arkansas, fraud consists of five elements: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Moss v. American Alternative Ins. Corp.*, 420 F.Supp.2d 962, 965 (E.D.Ark. 2006). Federal procedural law requires that allegations of fraud be pleaded with particularity. Fed.R.Civ.P. 9(b). This means the who, what, when, where and how. *Great Plains Trust Co. v. Union Pacific. R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007).

As previously noted, plaintiffs allege that LCA represented to Dr. Murphy that it would not send out the January patient notification letter until he approved it, that LCA sent the letter without his consent and forged his signature on it as if he had authorized it, that Dr. Murphy did not agree with the content of the letter, and that the "forged" January patient notification letter "fraudulently represented to Dr. Murphy's and LasikPlus Murphy's patients that Dr. Murphy had abandoned them as their physician and transferred their care to an unnamed physician affiliated

15

with TLC."   The Court finds, as it did with plaintiffs' tortious interference and defamation

claims, that the January patient notification letter can reasonably be construed as representing

that Dr. Murphy had abandoned his patients and that plaintiffs suffered damages therefrom.  As

plaintiffs have pleaded their allegations of fraud with particularity as required by Fed.R.Civ.P.

9(b), the Court finds that plaintiffs have pled a facially plausible fraud claim.  Accordingly, the

Court denies LCA's motion to dismiss Count Seven of plaintiffs' first amended complaint.[6]

4.

LCA next moves to dismiss Count Eight – Invasion of Privacy.  LCA argues this claim

should be dismissed because plaintiffs have failed to allege invasion of privacy by either false

light or appropriation.

The right to recover for a false-light invasion-of-privacy claim is conditioned upon the

complaining party's demonstrating that the false light in which he was placed by the publicity

would be highly offensive to a reasonable person, and that the defendant had knowledge of or

acted in reckless disregard as to the falsity of the publicized matter and the false light in which the

plaintiff would be placed.  *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 638, 590 S.W.2d

840, 845 (1979).  An actionable claim for an appropriation invasion-of-privacy claim, in turn,

consists of use of the plaintiff's name or likeness for defendant's benefit.  *Milam v. Bank of*

*Cabot*, 327 Ark. 256, 263, 937 S.W.2d 653, 657 (1997).  The defendant must have capitalized on

the use of the plaintiff's likeness or name by selling more of a product or service.  *Stanley v.*

---

[6] The Court notes that plaintiffs state that the alleged fraud was discovered on January 15, 2009 – two weeks after the date of the January patient notification letter — and that on March 27, 2009, LCA sent out a supplemental patient notification letter that was approved by plaintiffs and corrected any alleged misrepresentations in the January patient notification letter. Thus, any damages from LCA's alleged fraud arguably would only have been incurred no later than in the period between the January patient notification letter and the March supplemental patient notification letter.  *See Moss*, 420 F.Supp.2d at 965 ("When a plaintiff discovers the misrepresentation and protects his interests rather than acting in reliance on it, the misrepresentation is not actionable.").

16

*General Media Communications, Inc.*, 149 F.Supp.2d 701, 706 (W.D.Ark. 2001).  "The tort of invasion of privacy-appropriation requires *commercial* use of a person's name or likeness."  *Id.*

Plaintiffs premise their false light and appropriation claims on the January patient notification letter and LCA's continued running of advertisements in the Little Rock market in January and February 2009 that may have used the likeness and/or name of Dr. Murphy.  The January patient notification letter with Dr. Murphy's alleged forged signature can reasonably be construed as representing abandonment by plaintiffs of their patients thereby casting plaintiffs in a false light.  Additionally, given LCA's admission that advertisements placed with the media prior to December 12, 2008 may have continued to run in the Little Rock market in January and February 2009, any use at that time of Dr. Murphy's name and/or likeness in advertisements and the reference in the January patient notification letter that "we remain available to see you" (the "we" including Dr. Murphy) when LCA knew that Dr. Murphy would no longer be affiliated with LCA might properly be considered a "bait and switch" whereby LCA capitalized on Dr. Murphy's likeness and/or name to sell more of a product or service, a requirement for an appropriation claim.  *See Stanley*, 149 F.Supp.2d at 706.  The Court finds that plaintiffs have pled facially plausible false light and appropriation claims and accordingly denies LCA's motion to dismiss Count Eight of plaintiffs' first amended complaint.

5.

LCA next moves to dismiss Count Four – Civil Recovery for Criminal Conduct.  LCA argues this claim should be dismissed because plaintiffs failed to allege either a felony under Arkansas law or damages from the alleged forgery of Dr. Murphy's name to the January patient notification letter.

Arkansas's crime victims civil liability statute, Ark. Code Ann. § 16-118-107, provides a civil cause of action to "[a]ny person injured or damaged by reason of conduct of another person that would constitute a felony under Arkansas law."  The Court first notes that two of the criminal statutes upon which plaintiffs rely in support of their claim – 18 U.S.C. §§ 1341, 1342 – are federal mail fraud statutes and thus are not applicable to Ark. Code Ann. § 16-118-107 under the plain language of the statute; conduct that constitutes mail fraud under federal law does not "constitute a felony under Arkansas law" as is required for a civil action under Ark. Code Ann. § 16-118-107.  Accordingly, the Court grants LCA's motion to dismiss Count Four of plaintiffs' first amended complaint insofar as it concerns federal mail fraud statutes.

Plaintiffs, however, also rely on Arkansas's forgery statute, Ark. Code Ann. § 5-37-201, which is encompassed within the rubric of  Ark. Code Ann. § 16-118-107.  Arkansas's forgery statute provides as follows:

> (a) A person forges a written instrument if, with purpose to defraud, the person makes, completes, alters, counterfeits, possesses, or utters any written instrument that purports to be or is calculated to become or to represent if completed the act of a person who did not authorize that act.
>
> (b) A person commits forgery in the first degree if he or she forges a written instrument that is:
>
>> (1) Money, a security, a postage or revenue stamp, or other instrument issued by a government; or
>>
>> (2) A stock, bond, or similar instrument representing an interest in property or a claim against a corporation or its property.
>
> (c) A person commits forgery in the second degree if he or she forges a written instrument that is:
>
>> (1) A deed, will, codicil, contract, assignment, check, commercial instrument, credit card, or other written instrument that does or may evidence, create, transfer, terminate, or otherwise affect a legal

right, interest, obligation, or status;

(2) A public record, or an instrument filed or required by law to be filed, or an instrument legally entitled to be filed in a public office or with a public servant; or

(3) A written instrument officially issued or created by a public office, public servant, or government agent.

(d) Forgery in the first degree is a Class B felony.

(e) Forgery in the second degree is a Class C felony.

Ark. Code Ann. § 5-37-201.

Plaintiffs claim that by terminating the physician-patient relationship between Dr. Murphy and his patients and transferring future care to TLC, the January patient notification letter constitutes a "written instrument that does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status" under Ark. Code Ann. § 5-37-201(c)(1) and that LCA committed a felony under § 5-37-201 by forging Dr. Murphy's signature to the letter, thereby giving rise to a civil action under Ark. Code Ann. § 16-118-107.  As the January patient notification letter could reasonably be construed as representing that plaintiffs were abandoning their patients or that LCA was terminating the physician-patient relationship between plaintiffs and the Little Rock Center's patients, the January patient notification letter arguably constitutes a "written instrument that does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status."  Accordingly, plaintiffs have pled a facially plausible claim under Ark. Code Ann. § 16-118-107 and the Court denies LCA's motion to dismiss Count Four of plaintiffs' first amended complaint insofar as it concerns Arkansas's forgery statute, Ark. Code Ann. § 5-37-201.

6.

LCA next moves to dismiss Count Two – Breach of Contract for Violation of State Law and Count Three – Breach of Contract for Violation of Federal Law (Mail Fraud).  LCA argues these claims should be dismissed because no private right of action exists for most of the laws cited and plaintiffs have failed to allege damages from LCA's violation of those laws.

Paragraph 6 of the PMA requires compliance with applicable laws, rules, and regulations:

**6.  Compliance with Laws and Regulations**.  PA [LasikPlus Murphy] and Manager [LCA] in the performance of their respective obligations hereunder shall comply with all applicable laws, rules and regulations, and do everything in their power to ensure that the conduct of the Practice at each Office (including the operation of the Laser System) is in compliance with the rules of any accrediting or regulatory body, agency or authority having jurisdiction over the Practice.

In Counts Two and Three of the first amended complaint, plaintiffs allege LCA breached paragraph 6 of the PMA by

(1) violating the Arkansas Medical Corporation Act, Ark. Code. Ann. § 4-29-305, by engaging in the practice of medicine in the State of Arkansas as a corporate entity comprised of shareholders who are not licensed to practice medicine within the State of Arkansas;

(2) violating Arkansas state law regarding the unauthorized practice of medicine, Ark. Code Ann. § 17-95-201, a total of 84,366 times by making unauthorized referrals and/or transfers of plaintiffs' patients to another treating physician and permitting such unauthorized referrals to go uncorrected for a period of 86 days;

(3) violating Arkansas state law regarding the unauthorized practice of medicine, Ark. Code Ann. §§ 17-95201, an unknown number of additional times by making unauthorized referrals and/or transfers of plaintiffs' scheduled patients in January and February 2009 to another treating physician at TLC;

(4) violating Arkansas state law regarding the unauthorized practice of medicine, Ark. Code Ann. §§ 17-19201, 17-80-110, 17-80-111, 17-80-113, a total of 84,366 times by misrepresenting itself as a licensed physician and forging the name of a licensed physician to patients in the January patient notification letter regarding patient care, and permitting such misrepresentations to go uncorrected for a period of 86 days;

(5) violating the Arkansas Deceptive Trade Practices Act (ADTPA), Ark. Code

Ann. §§ 4-88-101 *et. seq.*, by fraudulently misrepresenting to Dr. Murphy's and LasikPlus Murphy's patients that its shareholders were authorized to practice medicine in the State of Arkansas;

(6) violating the ADTPA by fraudulently misrepresenting in the January patient notification letter to Dr. Murphy's and LasikPlus Murphy's patients that Dr. Murphy and LasikPlus Murphy had authorized, recommended, and/or referred their patients to an unnamed physician affiliated with TLC for follow-up care and treatment;

(7) violating the ADTPA by continuing to advertise laser corrective vision surgery at the Little Rock Center with a lifetime visual acuity warranty and free lifetime enhancements, in some cases for discounted prices if surgery was performed on or before December 31, 2008, with knowledge that it would be closing the Little Rock Center on December 31, 2008, and the closest LCA affiliated entity that could honor the lifetime visual acuity warranty would be located over four hours away in Oklahoma City, OK;

(8) violating the ADTPA by circulating fraudulent advertising to residents of Little Rock that Dr. Murphy was affiliated with LCA after December 31, 2008, following LCA's breach and early termination of the PMA;

(9) violating the ADTPA by fraudulently misrepresenting in advertising to residents of Little Rock that its shareholders were authorized to practice medicine in the State of Arkansas after December 31, 2008;

(10) violating the Arkansas Medical Corporation Act, Ark. Code Ann. § 4-29-305, by holding itself out to the public in advertisements that it was licensed to practice medicine in the State of Arkansas as a corporate entity comprised of shareholders who were not licensed to practice medicine within the State of Arkansas after December 31, 2008;

(11) violating Arkansas state law regarding the unauthorized practice of medicine, Ark. Code Ann. §§ 17-19201, 17-80-110, 17-80-111, 17-80-113, by holding itself out to the public in advertisements that it was licensed to practice medicine in the State of Arkansas as a corporate entity comprised of shareholders who were not licensed to practice medicine within the State of Arkansas after December 31,2008;

(12) violating Arkansas state law regarding the unauthorized practice of medicine, Ark. Code Ann. § 17-95201;

(13) violating the ADTPA by fraudulently misrepresenting to 981 patients in the January patient notification letter that lifetime acuity warranties would be honored

for all 981 patients at TLC in Little Rock, AR until May 1, 2009, and failing to
honor acuity warranties for many patients;

(14) violating the ADTPA by fraudulently misrepresenting to 981 patients in the
January patient notification letter that follow-up care would be provided at TLC
when it had no formal agreement in place for TLC to provide follow-up care for
patients of Dr. Murphy and LasikPlus Murphy;

(15) violating the ADTPA by fraudulently misrepresenting to 981 patients in the
January patient notification letter that follow-up care would be provided at TLC; at
the time the correspondence was sent to Dr. Murphy's and LasikPlus Murphy's
patients, LCA represented to Dr. Murphy and LasikPlus Murphy that no formal
agreement was in place for TLC to provide follow-up care for patients of Dr.
Murphy and LasikPlus Murphy, and certain patients of Dr. Murphy and LasikPlus
Murphy were subsequently turned down for follow-up care by TLC and/or TLC-
affiliated physicians;

(16) engaging in the criminal offense of false, fraudulent, and misleading
advertising in violation of Ark. Code Ann. § 5-37-515;

(17) engaging in the criminal offense of forgery in violation of Ark. Code Ann. §
5-37-201;

(18) engaging in the criminal offense of criminal impersonation in violation of
Ark. Code Ann. § 5-37-208;

(19) committing mail fraud in violation of 18 U.S.C. § 1341 by devising a scheme
or artifice to deprive 981 patients of Dr. Murphy and LasikPlus Murphy the
intangible right of honest services by virtue of the forged and fraudulent January
patient notification letter that purported to refer Dr. Murphy's patients to TLC; and

(20) committing mail fraud in violation of 18 U.S.C. § 1342 by using a false,
fictitious, and/or assumed name and title in the fraudulent January patient
notification letter that purported to refer Dr. Murphy's patients to TLC.

First Am. Compl. ¶¶ 62-79, 85-86.

LCA argues that there is no private right of action for most of the laws being invoked but

plaintiffs argue that they are not seeking to create private rights of action for violation of these

laws but are only claiming that each of LCA's alleged violation of these state and federal laws

constitutes a separate ground for plaintiffs' breach of contract claim with respect to paragraph 6

of the PMA.[7]  The Court has considered the matter and determines that plaintiffs have stated

facially plausible claims with respect to their ADTPA claims in Count Two of their first amended

complaint which allege that LCA breached paragraph 6 of the PMA by

> (6) violating the ADTPA by fraudulently misrepresenting in the January patient notification letter to Dr. Murphy's and LasikPlus Murphy's patients that Dr. Murphy and LasikPlus Murphy had authorized, recommended, and/or referred their patients to an unnamed physician affiliated with TLC for follow-up care and treatment;

> (7) violating the ADTPA by continuing to advertise laser corrective vision surgery at the Little Rock Center with a lifetime visual acuity warranty and free lifetime enhancements, in some cases for discounted prices if surgery was performed on or before December 31, 2008, with knowledge that it would be closing the Little Rock Center on December 31, 2008, and the closest LCA affiliated entity that could honor the lifetime visual acuity warranty would be located over four hours away in Oklahoma City, OK;

> (8) violating the ADTPA by circulating fraudulent advertising to residents of Little Rock that Dr. Murphy was affiliated with LCA after December 31, 2008, following LCA's breach and early termination of the PMA;

> . . .

> (13) violating the ADTPA by fraudulently misrepresenting to 981 patients in the January patient notification letter that lifetime acuity warranties would be honored for all 981 patients at TLC in Little Rock, AR until May 1, 2009, and failing to honor acuity warranties for many patients;

> (14) violating the ADTPA by fraudulently misrepresenting to 981 patients in the January patient notification letter that follow-up care would be provided at TLC when it had no formal agreement in place for TLC to provide follow-up care for patients of Dr. Murphy and LasikPlus Murphy; and

> (15) violating the ADTPA by fraudulently misrepresenting to 981 patients in the

---

[7] Plaintiffs state in a footnote to their response to LCA's initial partial motion to dismiss that they "do claim a private right of action pursuant to A.C.A. § 16-118-107 under Counts Two and Three of the Complaint for civil recovery for Defendant's forgery and mail fraud." *See* Pls.' Resp. to Def.'s Partial Mot. to Dismiss at 22 n.6 [doc.#12]. To the contrary, Counts Two and Three of plaintiffs' first amended complaint make no such claim but only assert breach of contract with respect to paragraph 6 of the PMA. Plaintiffs' claim for civil recovery under Ark. Code Ann. § 16-118-107 is only set forth in Count Four of the first amended complaint and, as previously noted, is limited to Arkansas's forgery statute (Ark. Code Ann. § 5-37-201) as the two federal mail fraud statutes upon which plaintiffs rely (18 U.S.C. §§ 1341, 1342) are not applicable to Ark. Code Ann. § 16-118-107.

> January patient notification letter that follow-up care would be provided at TLC; at
> the time the correspondence was sent to Dr. Murphy's and LasikPlus Murphy's
> patients, LCA represented to Dr. Murphy and LasikPlus Murphy that no formal
> agreement was in place for TLC to provide follow-up care for patients of Dr.
> Murphy and LasikPlus Murphy, and certain patients of Dr. Murphy and LasikPlus
> Murphy were subsequently turned down for follow-up care by TLC and/or TLC-
> affiliated physicians.

First Am. Compl. ¶¶ 67-69, 74-76.  The Court additionally determines that plaintiffs have

sufficiently alleged damages with respect to these six ADTPA claims.[8]

With respect to the remainder of plaintiffs' alleged violations of the ADTPA and other

state and federal laws in Counts Two and Three of the first amended complaint, no convincing

argument has been made that these laws constitute "applicable" laws under paragraph 6 of the

PMA.  But even if they do, the Court finds that these alleged violations may have damaged the

State of Arkansas, the federal government and/or plaintiffs' patients, but they for the most part do

not have a sufficient nexus to plaintiffs themselves to state facially plausible claims.  For

example, even if, as alleged by plaintiffs, LCA engaged in the unauthorized practice of medicine,

plaintiffs have not stated a plausible connection between any such violation and any damages they

suffered.

In sum, the Court denies in part and grants in part LCA's motion to dismiss Counts Two

and Three of plaintiffs' first amended complaint. The Court denies LCA's motion with respect to

the six alleged ADTPA violations set forth above and grants LCA's motion in all other respects.

7.

---

[8] In *Mosby v. International Paper Co., Inc.*, No. 5:07cv00314-WRW, 2008 WL 2669148, at *2 (E.D.Ark. July 1,
2008), the court, relying on the Preamble to the ADTPA, concluded that the ADTPA does not apply to non-consumers or
providers of services.  However, in *Electrocraft Arkansas, Inc. v. Super Elec. Motors, Ltd*, No. 4:09cv00318 SWW, 2009 WL
5181854, at *7 (E.D.Ark. Dec. 23, 2009), this Court rejected the reasoning and conclusion of *Mosby*, determining that even
though it may seem or appear at first glance that the ADTPA does not apply to non-consumers, the plain and unambiguous text
of the ADTPA is controlling and makes clear that the ADTPA is meant to protect both the consumer public and the legitimate
business community and that one does not have to be a consumer to recover under the ADTPA.

LCA next moves to dismiss Count Eleven – Punitive Damages on grounds that the underlying causes of action supporting punitive damages fail as a matter of law.  However, because the Court today denies LCA's motion to dismiss several of plaintiffs' causes of action that would support an award of punitive damages, the Court denies at this time LCA's motion to dismiss Count Eleven of plaintiffs' first amended complaint.

8.

Finally, LCA moves to dismiss Count Ten – Breach of Fiduciary Duty.  LCA argues this claim should be dismissed because plaintiffs have alleged nothing more than that LasikPlus Murphy was a party to a contract with LCA and that as a result, plaintiffs have failed to plead a plausible basis for the existence of a fiduciary relationship.

Breach of fiduciary duty involves betrayal of a trust and benefit by the dominant party at the expense of one under his influence.  *Cole v. Laws*, 349 Ark. 177, 185, 76 S.W.3d 878, 883 (2002).  The various aspects of the fiduciary relationship are as follows:

> [A] person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship.  *Long v. Lampton, supra* [324 Ark. 511, 922 S.W.2d 692 (1996)].  It follows that, regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty.  *See Berry v. Saline Memorial Hosp.,* 322 Ark. 182, 907 S.W.2d 736 (1995); *Texas Oil & Gas Corp. v. Hawkins Oil & Gas, Inc.,* 282 Ark. 268, 668 S.W.2d 16 (1984); *Yahraus v. Continental Oil Co.,* 218 Ark. 872, 239 S.W.2d 594 (1951).  The guiding principle of the fiduciary relationship is that self-dealing, absent the consent of the other party to the relationship, is strictly proscribed.  *See Hosey v. Burgess,* 319 Ark. 183, 890 S.W.2d 262 (1995).

*Id*. (quoting *Sexton Law Firm, P.A. v. Milligan,* 329 Ark. 285, 298, 948 S.W.2d 388, 395 (1997)).

Self-dealing breaches the fiduciary duty even when the action taken is innocent and unintentional.

 *Id*. 349 Ark. at 185-86, 76 S.W.3d at 883 (quoting *Burgess,* 319 Ark. 183, 890 S.W.2d 262).

Before there can be a breach of a fiduciary duty, a fiduciary relationship or a confidential relationship must exist. *West Memphis Adolescent Residential, LLC v. Compton*, 2010 Ark.App. 450, — S.W.3d —, —, 2010 WL 2132003 (2010). The determination as to the existence of a fiduciary duty is a matter of law for the Court. *Sexton Law Firm*, 329 Ark. at 297, 948 S.W.2d at 394-95.

Plaintiffs essentially base their claim of a fiduciary relationship on the creation of a principal-agent relationship as a result of LasikPlus Murphy's and LCA's entry into the PMA. Certainly, "'a fiduciary relationship exists between principal and agent in respect to matters within the scope of the agency.'" *Carpenter v. Layne*, 2010 Ark. App. 364, — S.W.3d —, 2010 WL 170483 (2010) (quoting *Dent v. Wright*, 322 Ark. 256, 261, 909 S.W.2d 302, 304 (1995)).[9] Contracting parties, however, do not necessarily owe fiduciary duties to each other. *Compton*, 2010 Ark.App. 450, — S.W.3d —, 2010 WL 2132003 (citing *Evans Industrial Coatings, Inc. v. Chancery Court of Union County*, 315 Ark. 728, 870 S.W.2d 701 (1994)). *See also Geovera Specialty Ins. Co. v. Graham Rogers, Inc.*, No. 4:08cv00163 SWW, 2008 WL 2704651, at *3 (E.D.Ark. July 07, 2008) (this Court noting that it is critical to plaintiff's claim that the existence of a fiduciary duty be established and "[t]he Court finds no authority for imposing a 'fiduciary duty of good faith and fair dealing' based purely on a contractual relationship"); *Evans Industrial Coatings,* 315 Ark. at 734, 870 S.W.2d at 703-04 (complaint "simply alleged that [contractor and consultant] were parties to an agreement who had promised to perform certain acts," and "[n]o particular relationship of trust or confidence developed because of the agreement"). Contrary to

---

[9] The two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control. *Taylor v. Gill*, 326 Ark. 1040, 1043, 934 S.W.2d 919, 921 (1996).

the first amended complaint's allegations of a fiduciary relationship, the PMA provides that LasikPlus Murphy and LCA are independent contractors, *see* PMA ¶ 12 ("Each party is an independent contractor of the other"), and that it "is not intended, and shall not be construed, to create a relationship of employment, joint venture, partnership or association as between [LCA] and [LasikPlus Murphy] or any of [LasikPlus Murphy's] Physicians." *Id.* The only facts alleged in the first amended complaint in support of a fiduciary relationship are LCA's contractual obligations under the PMA. *See* First Am. Compl. ¶¶ 133-140. These contractual obligations, however, are insufficient to give rise to a fiduciary relationship between LCA and LasikPlus Murphy.

It is true that the PMA also provides that "[s]olely for the purpose of carrying out the billing and collection services hereunder, [LasikPlus Murphy] hereby appoints [LCA] as its agent and its true and lawful attorney-in-fact" for purposes of exercising the exclusive right to bill and collect for services provided by LasikPlus Murphy. *See* PMA ¶ 2(p); First Am. Compl. at ¶ 134. Plaintiffs, however, do not allege a breach of a fiduciary duty relating to LCA's billing and collection of LasikPlus's accounts receivable. The alleged misconduct that is the focus of the action is not within the scope of the fiduciary relationship set forth in the PMA. Rather, the first amended complaint only offers facts indicating violation of the contractual relationship that is not within any fiduciary obligations that LCA otherwise owed the plaintiffs. Accordingly, the Court grants LCA's motion to dismiss Count Ten of plaintiffs' first amended complaint.

## III.

For the foregoing reasons, the Court grants in part and denies in part LCA's initial partial motion to dismiss [doc.#7] and grants LCA's subsequent motion to dismiss Count Ten of

plaintiffs' first amended complaint [doc.#29].

IT IS SO ORDERED this 4th  day of March 2011.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE